UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:10-cr-03-SEB-KPF |
| | ) | |
| JUAN CARLOS ADAME-HERNANDEZ, | ) | -01 |
| DOMINIC ROBINSON, | ) | -02 |
| RAMONE MOCKABEE, | ) | -03 |
| a/k/a "Mone," a/k/a "Shorty," a/k/a | ) | |
| "Raymone Mockabee," | ) | |
| DAMON LUTER, | ) | -04 |
| a/k/a "DL," | ) | |
| KENNETH JONES, | ) | -06 |
| a/k/a "Kenfolk," | ) | |
| ELISHA DRAKE, | ) | -09 |
| a/k/a "Kelly," a/k/a "Killer Kel," | ) | |
| GEORGE MEREDITH, | ) | -11 |
| a/k/a "Worm," | ) | |
| DEVON YOUNG, and | ) | -17 |
| DAMON CHRISTIAN, JR., | ) | -20 |
| | ) | |
| Defendants. | ) | |

**ORDER DENYING DEFENDANTS' MOTION TO SUPPRESS WIRETAPS**

This matter is before the Court on Defendants' Motion to Suppress Wiretaps [Docket No. 554], filed on October 20, 2010, by Defendants Juan Carlos Adame-Hernandez, Dominic Robinson, Ramone Mockabee, Damon Luter, Kenneth Jones, Elisha Drake, George Meredith, Devon Young, and Damon Christian, Jr. Defendants argue that the government did not establish necessity for conducting wire surveillance as required by

18 U.S.C. § 2518(1)(c), and thus that the intercepted telephone communications should be suppressed. The Motion has been fully briefed by the parties, and, based on our review of the briefing and the applicable principles of law explicated below, the Motion to Suppress is hereby <u>DENIED</u>.

## Factual Background

The government obtained four separate court orders authorizing wire surveillance in this case. Defendants are challenging the affidavits filed in support of each of the applications, arguing that they do not meet the requirements for establishing necessity as required by 18 U.S.C. § 2518(1)(c). We address the factual averments contained in each affidavit in turn.

**The October 26, 2009 Wiretap Application**

The court granted the first wiretap application on October 26, 2009, authorizing the FBI to conduct wire surveillance over a cellular telephone used by a charged co-defendant, Diomoni Small ("Target Phone I"). Of the remaining defendants still in this case and awaiting trial, Ramone Mockabee and Elisha Drake were the two individuals named as likely interceptees in the application based on the averments in the affidavit filed in support of the First Application ("Affidavit 1") naming Ramone Mockabee and Diomoni Small as the targets of a pending investigation.

Affidavit 1 discussed the various law enforcement investigative techniques that

were available to investigate the conspiracy, namely, informants, undercover officers, telephone records and pen registers, physical surveillance, search warrants, and grand jury subpoenas, and asserted that those techniques were insufficient to achieve the goals of the investigation. The use of confidential sources as a means of investigation was addressed first in the affidavit. Affidavit 1 indicated that the FBI used one active informant during the investigation and identified the informant as "Individual #1." Individual #1 had regularly obtained crack cocaine from Diomoni Small before cooperating with the FBI and executing three controlled purchases of crack cocaine from Small for the FBI. Individual #1 also knew that Ramone Mockabee had supplied cocaine to Small because the informant had observed Small refer other individuals to Mockabee to purchase cocaine.

Individual #1's cooperation did not accomplish the goals of the investigation as set forth in the affidavit, however, because he/she had not witnessed any transactions between Mockabee and the cocaine customers referred by Small. Although Individual #1 stated that he/she had talked to Mockabee over the telephone about non-criminal matters, he/she also indicated an inability to engage in drug-related telephone conversations with Mockabee. Moreover, while Individual #1 was able to provide some information about Small's cocaine runners and distributors, he/she did not know all of Small's cocaine customers, could only provide limited information regarding Small's money laundering activity (e.g., that Small laundered drug proceeds by purchasing real estate), and did not know where Small stored his cocaine or drug proceeds, the amount of cocaine that Small

received from Mockabee, or the frequency of the cocaine transactions between the two. Individual #1 had seen Small convert powder cocaine into crack cocaine at a residence located at 781 West 25th Street, but did not know whether Small stored drugs or proceeds of drug sales at his residence. Finally, although Individual #1 was able to purchase cocaine from Small, he/she professed an inability to purchase cocaine from other suspected traffickers because they attempted to insulate the identities of their sources from their customers to prevent the customers from dealing directly with the source and eliminating potential profits.

Affidavit 1 also indicated that a named person who had been convicted of drug crimes had provided a statement to the FBI about Small's cocaine dealing in 2004, acknowledging that he (the informant) had provided kilogram quantities of cocaine to Small. However, that informant's cooperation did not accomplish the goals of the investigation because he did not identify any relationship between Small and Mockabee and was unable to provide any current information about Small's cocaine trafficking activity as he had been incarcerated since the time he gave his statement.

With regard to the possibility of additional cooperating witnesses coming to light, Affidavit 1 stated that even if such witnesses came forward, they would likely be unable to provide sufficient information to achieve the goals of the investigation because individuals working for complex drug trafficking organizations generally perform discrete tasks and are unaware of all of the other members involved. Affidavit 1 further provided that it was doubtful whether members of the conspiracy would be truthful if

4

interviewed because their statements could be incriminating and that attempted interviews with individuals suspected of trafficking with Small might compromise the investigation by alerting other members of the claimed conspiracy to the interest of law enforcement.

In addition, Affidavit 1 addressed the use of undercover officers as an investigative technique. The affidavit stated that the FBI considered using an undercover agent to further the investigation, but did not attempt the technique because it appeared unlikely to succeed. In support of this proposition, Affidavit 1 stated that Individual #1 had indicated that he/she would be unable to introduce an undercover agent to either Mockabee or Small because neither would risk distributing cocaine to individuals with whom they had not had a history of trafficking for a significant period of time. Because higher-level drug traffickers typically become suspicious of individuals with whom they have never dealt controlled substances, the affiant opined that an undercover agent would be unable to gain the confidence of either target within a reasonable amount of time.

Affidavit 1 also indicated that the FBI attempted to use telephone records and pen registers, but that the use of these techniques fell short of achieving the goals of the investigation because the call detail records could not identify the participants in the telephone conversations or the subject matter of the conversations. Accordingly, the telephone records and pen register information did not enable the FBI to obtain sufficient evidence to identify the members of Small and Mockabee's cocaine trafficking organization and prove their innocence beyond a reasonable doubt.

The use of physical surveillance was also addressed in Affidavit 1. The FBI

attempted to conduct physical surveillance at Small's residence on five occasions and the location believed to be the place where Small distributed cocaine on four prior occasions, but did not observe any criminal activity during the surveillance attempts because the distance at which the agents were required to post themselves from the transactions to avoid detection was too great. The affidavit stated that the physical surveillance that had been attempted had failed to achieve the goals of the investigation, and, moreover, that it appeared unlikely to succeed if attempted in the future because Small's cocaine distribution location, 781 West 25th Street, was a high-crime area with heavy foot traffic and limited parking, thus preventing surveillance officers from being able to hide their vehicles and making it more likely to alert Small and his associates of the ongoing investigation. Affidavit 1 also noted that surveillance alone seldom provides sufficient information to support a drug trafficking prosecution.

Affidavit 1 addressed the use of search warrants, asserting that they reasonably appeared unlikely to succeed because the FBI had not identified the locations in which to search for controlled substances or drug proceeds (beyond the residence located at 781 West 25th Street where the FBI believed Small converted powder cocaine into crack cocaine) and did not have the ability to ascertain the quantity of cocaine or amount of money targeted individuals might have at any given time or place. Further, the affidavit stated that all of the members of the conspiracy would not likely be at one location at the same time with a large quantity of cocaine. Affidavit 1 noted that the execution of search warrants would alert Small and other members of the trafficking organization to the

ongoing investigation, thereby preventing the FBI from identifying additional conspirators.

Finally, Affidavit 1 stated that the use of grand juries and grand jury subpoenas alone at so early a stage in the development of this case would be ineffective in investigating the suspected cocaine trafficking organization because targets of the investigation would likely not cooperate before the grand jury and would invoke their Fifth Amendment right to remain silent. It was noted that subpoenaed targets might also alert the members of the organization about the federal investigation, causing them to flee or to otherwise compromise the integrity of the investigation. Affidavit 1 also stated that granting immunity to targeted individuals would not necessarily produce truthful testimony and could foreclose the prosecution of the most culpable members of the organization.

**The November 19, 2009 Wiretap Application**

On November 19, 2009, the court granted the second wiretap application, authorizing the FBI to continue monitoring Target Phone I as well as to conduct wire surveillance over Ramone Mockabee's cellular telephone (Target Phone II) and Lonnie Belmar's cellular telephone (Target Phone III). The named likely interceptees of conversations included Small, Mockabee, Belmar, Drake, and others initially charged in the indictment in this case. The affidavit filed in support of the November 19 application (Affidavit 2) reasserted the information provided by Individual #1 that was included in

the October 26 application and further provided that Individual #1 had told law enforcement that Belmar had purchased a home close to Church's Chicken Restaurant on West 25th Street, and that Belmar distributed crack cocaine from the residence. Affidavit 2 also asserted that the named informant referenced in Affidavit 1 had identified Belmar (in addition to Small) as one of his prior cocaine customers.

Affidavit 2 provided details of telephone conversations intercepted pursuant to the first application and order involving Target Phone I, Target Phone II, and Target Phone III. The affiant concluded that these conversations indicated that Mockabee supplied cocaine to Small, that Small cooked powder cocaine into crack cocaine for Mockabee, that Mockabee used Target Phone II to facilitate his drug trafficking activity, and that Small delivered cocaine to Belmar, who used Target Phone III to facilitate his drug trafficking activity.

In addition to reiterating the reasons set forth in the first application as to why the use of each traditional investigative technique would be ineffective, the second application included the following additional facts: With regard to the use of informants, Affidavit 2 provided that Individual #1 did not know Mockabee's cocaine source, all of his cocaine customers, his means of laundering drug proceeds, the amount of cocaine he receives from his source, or the location where he stores his cocaine or drug proceeds. Individual #1 also stated that he/she did not know any of Belmar's cocaine customers, his means of laundering drug proceeds, or the location where he stores his cocaine or drug proceeds. Finally, Individual #1 could not obtain crack cocaine from Belmar because

8

Belmar knew that Individual #1 obtained cocaine from Small.

Affidavit 2 also addressed new problems associated with physical surveillance that had arisen. Affidavit 2 asserted that the FBI had been unable to confirm Mockabee's residence as 2837 Indianapolis Avenue by physical surveillance, trash pulls, and record checks, and speculated that an effort to pull discarded trash from Belmar's residence at 736 West 25th Street would be detected. Affidavit 2 disclosed that, on November 10, 2009, the FBI had installed and activated "pole cameras," affording partial daytime surveillance of the residences at 781 West 25th Street and 736 West 25th Street. The affidavit noted that the cameras enabled the FBI to observed Mockabee, Small, and Belmar meeting with other individuals, but did not allow the FBI to ascertain the purpose of these meetings or monitor activities at these locations at night. Affidavit 2 asserted that agents could not effectively conduct sustained physical surveillance during either the day or night because heavy foot traffic in the area and limited parking made it difficult to conceal the vehicles used by law enforcement and would likely alert the targeted individuals to the ongoing investigation.

Finally, Affidavit 2 stated that the wire surveillance conducted over Target Phone I pursuant to the first court order had failed to accomplish the goals of the investigation. The initial wire surveillance had failed to identify either Mockabee's or Belmar's cocaine source, all of their cocaine customers, means of laundering drug proceeds, the quantity of cocaine distributed, or the location where the cocaine or drug proceeds were stored.

**The December 11, 2009 Wiretap Application**

A third wiretap application, also supported by affidavit ("Affidavit 3"), was granted on December 11, 2009, giving authorization for continued surveillance over Target Phone II (connected to Mockabee) and surveillance over a cellular telephone associated with Dominic Robinson ("Target Phone IV"). The third application named the same likely interceptees listed in the previous applications, with the addition of Juan LNU, a Hispanic male.

Affidavit 3 realleged the background provided in the previous two applications and reasserted the information and statements made in the previous two applications as to the necessity of wire surveillance. The December 11 affidavit also addressed the continued use of Individual #1 as an informant, asserting that, although previous wire surveillance had provided reason to believe that Robinson was a cocaine source for Mockabee and that Robinson obtained his cocaine from "Juan," Individual #1 had no information regarding "Juan" or the amount of cocaine Robinson receives from him, any information about Robinson's cocaine trafficking associates (other than Mockabee), Robinson's means of laundering drug proceeds, or the location that Robinson used to store his cocaine or drug proceeds. Individual #1 also stated that he/she could not obtain crack cocaine from Robinson.

Although at the time of the December 11 application, the use of the pole cameras in conjunction with wire surveillance had enabled the FBI to confirm that Mockabee occasionally sold cocaine from the residence located at 781 West 25th Street, that Small

10

sold cocaine from the residence located at 871 West 25th Street, and that Belmer sold cocaine from a residence located at 736 West 25th Street, the FBI had no information about other locations these individuals might use to stash cocaine or drug proceeds. Moreover, Affidavit 3 asserted that, without continued wire surveillance, the pole cameras would merely show Mockabee associating with various individuals but would not be useful in achieving the goals of the investigation. As was asserted in the prior applications, the affidavit stated that further physical surveillance appeared unlikely to succeed if attempted due to the high foot traffic in the area, limited parking, and absence of a location to conceal law enforcement's vehicles.

Affidavit 3 also reviewed conversations that had been intercepted pursuant to the November 19 wiretap order. The affiant stated he concluded from those conversations that Dominic Robinson used Target Phone IV to facilitate his cocaine trafficking activity and that Robinson supplied cocaine to Mockabee which Mockabee redistributed on November 25, 2009. Other intercepted telephone conversations overheard on Target Phone IV led the FBI to conclude that Robinson's cocaine supplier was a Hispanic male identified only as "Juan." Call detail records and trap and trace device records associated with Target Phone IV revealed 128 calls to and from the telephone number associated with "Juan." Conversations overheard on Target Phone II were interpreted by the FBI to be between Mockabee and his cocaine purchasers, who included Elisha Drake, Devon Hudgins, a "Val," and an unidentified male.

Affidavit 3 asserted that the previously authorized wire surveillance over Target

11

Phones I, II, and III failed to accomplish the goals of the investigation because it did not fully identify Robinson's cocaine supplier or the identity of Robinson's drug trafficking associations other than Mockabee, did not reveal Robinson's means of laundering drug proceeds, the amount of cocaine he obtains from his source, or the location he uses to store cocaine or drug proceeds. The previously authorized wire surveillance also failed to identify all of Mockabee's cocaine customers and his means of laundering drug proceeds.

**The January 7, 2010 Wiretap Application**

The fourth application for wiretaps and affidavit filed in support ("Affidavit 4"), were submitted to the court on January 7, 2010, and authorized on January 8, 2010, which allowed the FBI to intercept communications over a second cellular telephone associated with Dominic Robinson ("Target Phone V"), activated after Robinson ceased use of Target Phone IV. The affidavit outlined the information gathered from the previously ordered wiretap of Target Phone IV, including a series of telephone calls between Robinson and "Juan," who the FBI was able to identify as Juan Carlos Adame-Hernandez. A number of conversations between the two occurring on December 14, 2009 and December 15, 2009 ended with Adame-Hernandez's arrest after a confidential informant working with the DEA made a controlled purchase of cocaine from him. Robinson received information concerning the arrest over Target Phone IV and subsequently ceased use of that cellular telephone. A December 20, 2009 telephone call intercepted over Target Phone II revealed Target Phone V as Robinson's new cellular

12

telephone.

In addition to reasserting the reasons provided in prior affidavits for the need for additional wire surveillance, Affidavit 4 also stated that the previous wire surveillance over Target Phones I, II, III, and IV had not fulfilled all investigatory objectives. Specifically, it had not revealed the identity of Robinson's new cocaine supplier following Adame-Hernandez's arrest. Additionally, although the prior wire surveillance over Target Phones II and IV enabled the FBI to identify the telephone numbers of two of Robinson's cocaine trafficking associates, those associates remained unidentified. The FBI was able to identify a duplex located at 4502/4504 East 16th Street as a location where Robinson stored cocaine, but law enforcement was not able to determine any other locations that Robinson used to store drugs or drug proceeds, his means of laundering drug proceeds, or the amount of cocaine that Robinson distributes to his customers.

## **Legal Analysis**

The use of wire tapping is limited to situations where traditional methods of investigation are inadequate and such procedures are "not to be routinely employed as the initial step in criminal investigation." United States v. Giordano, 416 U.S. 505, 515 (1974). Each application for wire surveillance must contain "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). The government may establish the need for wire surveillance by

13

demonstrating any one of these three alternatives.  United States v. Ceballos, 302 F.3d 679, 683 (7th Cir. 2002).  This requirement is known as the exhaustion or necessity requirement.  United States v. Fudge, 325 F.3d 910, 919 (7th Cir. 2003).  Under Seventh Circuit law, the government's burden of proving necessity "is not great" and its compliance with the necessity requirement is "reviewed in a 'practical and common sense fashion.'"  United States v. Plescia, 48 F.3d 1452, 1463 (7th Cir. 1995) (quoting United States v. Zambrana, 841 F.2d 1320, 1329 (7th Cir. 1988)).

A court should grant a motion to suppress wire surveillance if "the order of authorization or approval under which it was intercepted is insufficient on its face."  18 U.S.C. § 2518(10)(a).  If such a motion is granted, "the contents of the intercepted wire or oral communications, or evidence derived therefrom shall be treated as having been obtained in violation of this chapter."  18 U.S.C. § 2525.

Both parties agree that the primary potential alternative means of investigating drug crime are the use of grand jury subpoenas, search warrants, physical surveillance, undercover agents, confidential informants, and telephone records and pen registers.  See United States v. Campos, 541 F.3d 735, 746-48 (7th Cir. 2008); Ceballos, 302 F.3d at 683.  Defendants concede that each of the four affidavits at issue in this case addressed these areas of potential alternative investigative techniques, setting forth explanations as to why those techniques failed or were unlikely to succeed in accomplishing the goals of the investigation.  Defendants contend that the affidavits nevertheless fail to establish necessity for wire surveillance because the reasons provided are no more than

"boilerplate" statements applicable to any drug investigation, and thus, a finding of necessity in this case would equate to a finding that intercepting wire communications is appropriate and available in every drug investigation case.

We disagree. It is true, as Defendants argue, that some of the reasons set forth by the government for the failure or expected failure of ordinary investigative techniques could be applicable to other drug cases as well as this one. However, our review of the affidavits filed in support of the applications for wiretaps reveal that they also contained numerous details as to the factual bases for the government's assertions that the initial and subsequent wiretaps were necessary to establish the full extent of the drug conspiracy that are particular to this case. For example, with regard to confidential informants, the government asserted that, although its informants were able to provide some helpful information, they only knew certain members of the conspiracy and were not in a position to obtain sufficient evidence of criminal activity to fully identify all members of the conspiracy or the individuals' methods of laundering money and locations for storing drugs and drug proceeds sufficiently for prosecution. These facts support a finding of necessity. See Ceballos, 302 F.3d at 684 (necessity requirement satisfied when informants could not "furnish information which would fully identify all members of [the] ongoing criminal conspiracy or which would define the roles of these conspirators sufficiently for prosecution").

Physical surveillance was deemed largely ineffective because the locations where the FBI needed to conduct surveillance are high-crime areas with heavy foot traffic and

limited parking, and thus, law enforcement would be easily detectable and would likely alert the members of the conspiracy to the ongoing investigation. Subsequent affidavits explained the difficulties associated with cameras that had been installed for surveillance purposes at 781 West 25th Street and 736 West 25th Street. Although the cameras allowed the FBI to observe certain members of the conspiracy meeting with various other individuals during the daytime hours, the affidavits provided that the cameras did not permit the FBI to ascertain the purpose of the meetings or monitor any activity at night, which did not allow law enforcement to achieve the goals of the investigation. These facts also support a finding of necessity. See id. at 683-84 (finding fact that physical surveillance would likely alert the subjects to the investigation showed necessity); Zambrana, 841 F.2d at 1330 (upholding affidavit that dismissed physical surveillance as an alternative investigative technique because surveillance could only be conducted in a limited fashion to avoid compromising the investigation).

The affidavits also state that, while the government considered the use of an undercover agent, it made no attempt to use an agent because its confidential informant advised that none of the significant members of the conspiracy would distribute cocaine in the presence of any individual who had not been trafficking with the conspiracy for a significant period of time. Cf. United States v. Gray, 410 F.3d 338, 343 (7th Cir. 2005) (finding necessity based in part on fact that an undercover agent would be unlikely to infiltrate the organization because of its insular nature). The affidavits filed in support of the government's applications also addressed the use of telephone records and pen

registers, indicating that, while the FBI used this technique, it did not enable the FBI to identify the participants in the telephone conversations or the subject matter of the discussions. Cf. Ceballos, 302 F.3d at 684 (finding affidavit sufficient where it explained that telephone records and pen registers did not reveal the participants in the conversation or the subject matter of the conversation). The affidavits further state why other investigative techniques, such as grand jury subpoenas and search warrants might provide some useful information, but would be insufficient to significantly penetrate the conspiracy and would risk alerting the targeted individuals, thereby compromising the investigation. Cf. Gray, 410 F.3d at 343 (finding an affidavit that stated dealers were likely to invoke Fifth Amendment if subpoenaed to testify before grand jury satisfied the necessity requirement); Campos, 541 F.3d at 747 (finding necessity shown in part because agents were unsuccessful in gathering enough evidence of drug storage locations to make search warrants feasible).

Finally, the second, third, and fourth applications contained specific details addressing why previous wiretaps failed to establish the full extent of the drug conspiracy and explaining the necessity for authorization for additional wire surveillance. In particular, the need to determine the identity and evaluate the level of involvement of the unknown individuals supplying cocaine to the high-level participants in the conspiracy provided a reasonable basis for the subsequent authorizations of wiretaps granted by the Court. See Zambrana, 841 F.2d at 1331-32 (finding a wiretap necessary despite some success with normal investigative techniques because those techniques were not likely to

17

identify all co-conspirators at all levels of the drug conspiracy).

Based on these factual assertions, we find that there was substantially more than merely an adequate showing in the government's applications for wiretaps that other investigative techniques would not likely have garnered the information necessary to identify and prosecute all of the members of the conspiracy. Accordingly, we <u>DENY</u> Defendants' Motion to Suppress.

IT IS SO ORDERED.


Date: ___12/21/2010_____

                                                _____
                                                SARAH EVANS BARKER, JUDGE
                                                United States District Court
                                                Southern District of Indiana

Copies to:

Bradley A. Blackington
UNITED STATES ATTORNEY'S OFFICE
bradley.blackington@usdoj.gov

Thomas A. Brodnik
DONINGER TUOHY & BAILEY LLP
tbrodnik@dtblegal.com

Ralph L. Tambasco
TAMBASCO & ASSOCIATES
tambascolawpc@aol.com

Kenneth Lawrence Riggins
Kennethriggins@yahoo.com

Harold Samuel Ansell
ATTORNEY AT LAW
attorneyansell@gmail.com

Victoria Ursulskis
ATTORNEY AT LAW
vursulsk@earthlink.net

Dana Childress-Jones
childressjones@aol.com

William H. Dazey Jr.
INDIANA FEDERAL COMMUNITY DEFENDERS
bill.dazey@fd.org

James A. Edgar
J. EDGAR LAW OFFICES, PC.
jedgarlawyer@gmail.com